# In the United States Court of Federal Claims

No. 15-490C
(Filed: August 29, 2018)

| | |
|---|---|
| PETERSON INDUSTRIAL DEPOT, INC., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE UNITED STATES, | ) ) |
| Defendant. | ) ) ) |

Partial Summary Judgment; Breach of Contract; Claim Accrual; Standing; Defense Base Closure and Realignment Act; Deed Interpretation

*James D. Gilson*, Salt Lake City, UT, for plaintiffs.

*Borislav Kushnir*, Civil Division, U.S. Department of Justice, Washington, D.C., with whom were *Chad A. Readler*, Acting Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, and *Franklin E. White, Jr.*, Assistant Director, for defendant.  *Maj. Collin P. Evans*, U.S. Army Legal Services Agency, Fort Belvoir, VA, of counsel.

**O P I N I O N**

**FIRESTONE**, *Senior Judge*

Pending before the court are the parties' cross motions for partial summary judgment (ECF Nos. 48 and 55) in this breach of contract and Fifth Amendment takings action brought by plaintiffs, Peterson Industrial Properties, LLC ("PIP"), Peterson Industrial Depot, Inc. ("PID"), and Jade Street Enterprises, L.L.C. ("Jade Street"), referred to collectively as the "Peterson Group" or "plaintiffs" against the United States ("the government").  The dispute in this case centers around a 1999 deed executed

1

between the United States Army ("Army") and the Redevelopment Agency of Tooele

City, Utah ("RDA"), pursuant to the Defense Base Closure and Realignment Act

("DBCRA"), Pub. L. No. 101-510, § 2901(b), 104 Stat. 1485, 1808, reprinted as amended

in 10 U.S.C. § 2687 note (2014).  By its terms, the deed conveyed a parcel of land within

the Toole Army Depot ("TEAD"), located in Toole, Utah, to the RDA.  The 1999 deed,

among other things, granted "joint use" rights to the Army and the RDA, as well as the

RDA's successors-in-interest, to an area known as the Rail Classification Yard, together

with certain rail lines that were identified in an accompanying exhibit to the deed.

Additionally, the deed provided that any easement granted by the Army to the RDA for

access to Army-retained railroad facilities, i.e., the Rail Classification Yard and certain

rail lines, would be at "no cost" to the RDA.  Shortly after the 1999 deed was executed,

the Army and the RDA entered into a Memorandum of Agreement ("MOA") "for the

purpose of granting the RDA the authority to allow its developer access to the railroad

classification yard and certain rail lines located on Army retained property . . . ."  1999

MOA at 1 (§ 1).  The 1999 MOA also provided that the Army would "be the sole

provider of rail service to access the rail classification yard and rail lines located on the

[conveyed] property . . . under a separate agreement," and that "[s]uch services [would]

be provided to the RDA at a reasonable cost."  1999 MOA at 1 (§ 3), 2 (§ 6(a)).

    Plaintiffs claim that they are the successors-in-interest to the RDA and that under

the express terms of the 1999 deed they should have received easements for access to the

Rail Classification Yard and the Southern Access Lines at "no cost."  They contend that

the Army breached the terms of the "no cost" commitment of the 1999 deed twice.  First,

in 2011 when Jade Street began building a loop line to connect the Jade Street Parcels

and the Rail Classification Yard after the Army refused a request for access to the

Southern Access Lines and Rail Classification Yard, and again in 2014 when the Army

insisted that PID pay it for rail services to use the Southern Access Lines in order to gain

access to the Rail Classification Yard.

The government argues in its pending motion that it is entitled to summary

judgment on plaintiffs' breach of contract claims for several reasons.  First, the

government argues that plaintiffs' claims against the government are time barred by the

six-year statute of limitations in 28 U.S.C. § 2501, because any breach of the deed

accrued in 1999 when the government entered into an MOA with the RDA which stated

that it would charge for rail services.[1]  Second, the government argues that if the breach

of contract claims are not time barred, then one of the plaintiffs, PID, does not have

standing because, unlike PIP and Jade Street, it is not a successor-in-interest under the

1999 deed and must be dismissed as a party.  Third, with regard to the remaining

plaintiffs, PIP and Jade Street, the government argues it is entitled to summary judgment

on the breach of contract claims because the 1999 deed did not include access to the Rail

Classification Yard using the Southern Access Lines or any promise by the Army to

provide easements for access to the Rail Classification Yard at "no cost."  According to

---

[1] The government's motion for summary judgment regarding the statute of limitations (ECF No. 69) was raised separately in supplemental briefing filed after the parties' initial cross motions for partial summary judgment were filed.

the government, the "no cost" commitment was meant only for the RDA's benefit and the deed did not, by its terms, extend that benefit to the RDA's successors-in-interest.

Plaintiffs in their cross motion argue that their breach of contract claims based on the 1999 deed are not barred by the statute of limitations because their claims did not accrue until the Army charged plaintiffs for use of the Southern Access Lines and for rail services in 2011 at the earliest, i.e., less than six years before they filed the pending action in 2015. Plaintiffs also argue that PID has standing, along with PIP and Jade Street, to maintain a breach of contract claim as a wholly owned subsidiary of PIP and because it has its own contracts with the Army. Plaintiffs argue with regard to the merits of their breach of contract claims that the government is liable for damages on the grounds that it is charging plaintiffs for services and for the use of rail lines contrary to the terms of the 1999 deed.

For the reasons set forth below, the court finds that plaintiffs' breach of contract claims accrued in 2011 when the Army refused to provide plaintiffs with access to the Southern Access Lines without cost and thus, the breach of contract claim is not barred by the six-year statute of limitations. The court agrees with the government that PID does not have standing as a successor-in-interest to the RDA because it does not own any of the relevant property conveyed by the Army to the RDA and thus it is not in privity with the government under the relevant 1999 deed. Finally, with regard to the merits of PIP and Jade Street's breach of contract claims, the court finds that the Army has not breached the terms of the 1999 deed by charging for use of the Southern Access Lines or

for rail services under the terms of the 1999 deed and thus, the government is entitled to

summary judgment on plaintiffs' breach of contract claims.

## I.    Statement of Undisputed Facts[2]

As noted above, this contract dispute arises in the context of the DBCRA.  Based

on the DBCRA mandate, the Army agreed to transfer a parcel of land within the TEAD

"consisting of approximately 1621 acres" to the RDA.

### A.    The 1999 Deed

The Army's grant to the RDA provides in relevant part as follows: "[For] the

monetary sum of $1.00, and other valuable consideration," the GRANTOR, which the

1999 deed defined as "the United States of America and its assigns," ". . . grant[ed] and

convey[ed] to the GRANTEE," which was defined as "the [RDA], unless otherwise

specifically provided [t]herein[,]" "all right, title, interest, claim and demand, which the

GRANTOR has in and to the [conveyed] Property . . ."  1999 deed at 1, 3–4 (§ A).

Railroad facilities, however, were conveyed to the RDA with certain conditions.  First,

"[t]he GRANTOR [i.e., the U.S.] reserve[d] the right to continue to use railroad facilities

within the Property at no cost to the GRANTOR" and "the right to enter upon the

Property for the purpose of maintaining those portions of the rail lines that are, or may in

a national emergency, be use by the GRANTOR."  *Id.* at 6 (§ A-3(a)).  Second, "[t]he

GRANTEE, [i.e., the RDA] and its successors and assigns, [could] not remove any

portion of the rail lines on the Property . . . which are currently or have the potential, in

---

[2] The following facts are taken from plaintiffs' amended complaint filed on February 1, 2017
(ECF No. 43).

case of national emergency, to be required for use by the GRANTOR, without the written

consent of the GRANTOR." *Id.* at 6 (§ A-3(b)).  Third, "[t]he railroad classification yard

and certain rail lines located on Army retained property, as shown in Exhibit K, [were]

available for joint use with the GRANTOR by the GRANTEE, and its successors and

assigns[,]" while "[a] non-exclusive easement for use of such GRANTOR retained

railroad facilities [would] be granted to the GRANTEE under a separate agreement." *Id.*

at 6 (§ A-3(c)).  Exhibit K to the 1999 deed depicted the Rail Classification Yard and the

"certain rail lines" described in section A-3(c).  *Id.* at Exhibit K.  It is not disputed that

the Southern Access Lines, which are at issue in this case, are not depicted in Exhibit K.

Only the Main Line and Western Pacific Line are depicted on the Exhibit K map.  In

addition, section D-18(f) of the deed, which is also at issue in this case, provided that

"[a]ll easements granted or contemplated to be granted to the GRANTEE by the

GRANTOR pursuant to this DEED [would] be granted at no cost to the GRANTEE." *Id.*

at 23 (§ D-18(f)).  As noted above, under the terms of the deed, when the word

"GRANTEE" is used by itself, it does not include successors-in-interest.

### B.   The 1999 Memorandum of Agreement

On January 7, 1999, the Army sent a letter aimed at "reaffirm[ing] that all legal

and proper easements to be granted by the Army to the . . . RDA[], its successors and

assigns, pursuant to the applicable provisions of [the 1999] Deed . . . [would] be granted

pursuant to the terms and provisions of the Deed[.]"  1999 Army letter.  The letter

clarified however that although "[t]he grant and use of such easements [would] be at no

cost to the RDA or its successors and assigns . . . the Army reserve[d] the right to assess

charges for Railroad Classification Yard services rendered by the Army." *Id.* On January 14, 1999, the Army and the RDA entered into an MOA "for the purpose of granting the RDA the authority to allow its developer access to the railroad classification yard and certain rail lines located on Army retained property, as shown on Exhibit A." 1999 MOA at 1 (§ 1).

The 1999 MOA provided that "[t]he railroad classification yard and certain rail lines [would] be made available for joint use with the Army" and that the "MOA [would] act as interim approval until a non-exclusive easement for use [could] be executed." *Id.* The 1999 MOA further clarified that the RDA's use of the Rail Classification Yard and "certain rail lines" was not limitless, stating that the Army would "be the sole provider of rail service to access the rail classification yard and rail lines located on the [conveyed] property . . . under a separate agreement," and that "[s]uch services [would] be provided to the RDA at a reasonable cost." *Id.* at 1 (§ 3), 2 (§ 6(a)). Further, the 1999 MOA provided that "[t]he use and occupation of the [conveyed property would] be subject to the general supervision and approval of the Installation Commander . . . and to such rules and regulations as may be prescribed from time to time by said officer." *Id.* at 2 (§ 5).

C. **Transfer of the Conveyed Property to Successors-in-Interest**

a. **Transfer of the Property to Plaintiffs' Predecessors-in-Interest**

On January 21, 1999, the RDA transferred the conveyed property to Endeavor Business Park, L.L.C. ("Endeavor") pursuant to the terms and conditions of the 1999 deed. That same day, Endeavor transferred part of the property to Depot Associates, L.L.C. (d/b/a Utah Industrial Depot) ("UID") and granted UID "an easement, over, across

and under the roads and any existing utility easements located on the 'Seller Retained Property[,]'" i.e., the part of the property Endeavor reserved for itself.  UID Special Warranty Deed at 1.

On October 13, 2000, the Army entered into a license agreement ("2000 License") with UID to provide UID with "access across government owned rail lines to access the Railroad Classification Yard for the purpose of temporary storage of rail cars on [TEAD] property."  2000 License at 2.  According to the license, UID was given "a license for use of an upper rail classification yard consisting of approximately .65 acres, of which UID [would] be using three rail lines . . ."  *Id.*  On April 15, 2008, the Army and UID entered into a new license agreement ("2008 License") that replaced the 2000 License and provided UID once again with "access across government owned rail lines to access the Railroad Classification Yard for the purpose of temporary storage of rail cars on [TEAD] property."  2008 License at 1.  Consistent with the 2000 License, the 2008 License also granted UID "a license for use of an upper rail classification yard consisting of approximately .65 acres, of which UID [would] be using three rail lines, as identified on Exhibit A . . ."  *Id.*

### b.    Transfer of the Property to Plaintiffs Jade Street and PIP

On September 12, 2011, UID transferred part of the conveyed property it retained to Jade Street, reserving "[a]n easement and the right to use the rail spur and the rail switches and crossings located on the property, including, but not limited to, the switch and/or connection connecting the Loop Line Spur to the [Western Pacific] line and the classification yard operated by the United States Army . . . for the movement of rail cars,

engines and trains." Jade Street Special Warranty Deed at 2. On January 30, 2013, UID transferred another part of the conveyed property to Ninigret Depot, L.C. ("Ninigret"). Ninigret Special Warranty Deed at 1. On January 31, 2014, Ninigret transferred its "rights, title, and interests in all rail lines, spur lines, and other similar lines used for the transportation of rail cars located within, on, or that might benefit, the [conveyed] Property[]" to Peterson Industrial Properties, LLC ("PIP") through a quitclaim deed, reserving however "an easement on, over and across all lines, spur lines, and other similar lines used for the transportation of rail cars located" on the conveyed property. PIP Quitclaim Deed at 1.

On October 31, 2014, Peterson Industrial Depot, Inc. ("PID"), a wholly owned subsidiary of PIP that operates a rail service business offering rail services and access to tenants of real property within the conveyed property, signed contract No. W52P1J-14-C-DF04 with the Army for "the sale of depot support services at . . . [TEAD.]" Contract of Sale at 1. The contract further specified that "[t]he Peterson Group ha[d] purchased property and buildings from Ninigret . . ." and that that "property [would] now be known as The Peterson Industrial Depot[,]" i.e., PID. *Id.* at 4. The support services the Army was to provide to PID included "pick[ing] up rail cars at the entrance and spot[ting] them" and "provid[ing] the equipment and crew required," at a cost of "$126.48 per hour Monday through Thursday from 06:15 to 16:45 hours and . . . $140.27 per hour for service provided outside [that] timeframe with a minimum of two (2) hours per call out." *Id.* at 1 (§ 2). On November 26, 2014, PID entered into a non-exclusive easement with

the Army for use of the Rail Classification Yard (the "2014 Easement").  The Easement

identified PID as a "successor-in-interest to the RDA."  2014 Easement at 1.

Thereafter, on December 1, 2014, PID and the Army entered into an MOA that set

out the Rail Classification Yard operating requirements under the 2014 Easement,

specifying that PID had the right to "use the classification yard for storage, arrangement,

and connecting of rail cars . . . and to use the rail classification 'main line' . . . and the

[Western Pacific] line for transporting rail cars into and out of the rail classification yard,

and for transporting cars to customer locations, but not for rail car storage."  2014 MOA

at 1.  On October 8, 2015, PID and the Army modified contract No. W52P1J-14-C-DF04,

increasing the cost for the support services provided by the Army to "$131.57 per hour,

Monday through Thursday from 0615 to 1645 hours and . . . $158.85 per hour, per man,

for services provided outside [that] timeframe . . . [with a] minimum of two (2) hours per

call out[.]"  Contract Modification at 1 (§ 4).  Since October 31, 2014, the Army has

charged plaintiffs for using the Southern Access Lines, insisting it is the sole operator on

those rail lines, and for providing rail services.  Plaintiffs also claim that that the Army

has not maintained the Southern Access Lines in good condition.

## II.    Statement of Disputed Facts

In addition to the undisputed facts set forth above, plaintiffs have submitted the

declaration of Jed Connell, the vice president and comptroller of Endeavor, and earlier

successor-in-interest to the RDA, to support their assertion that the Southern Access

Lines were included in the 1999 deed and that Endeavor understood that it would not be

required to pay for use of the Southern Access Lines or for any rail services that

Endeavor was capable of providing on its own.  Mr. Connell states in his declaration that

he "was involved in the negotiation of the terms of the [1999] deed" and "had direct and

frequent communication with Dorinda Benson [Ware], a Senior Realty Specialist for the

Army, regarding the nature and scope of the joint use and easement rights being

transferred via the Deed."  Connell Decl. at ¶¶ 4–5.  Mr. Connell states that "Endeavor

[had] expected to have joint use rights and an easement on the Combat Lines, the Lead

Lines and the [Southern Access Lines[,]" and that the Army had understood such

expectation and had "intended these rights to be transferred via the Deed."  Id. at ¶¶ 9–10.

In addition, Mr. Connell states that it was his understanding that Endeavor not be

required to pay the Army for rail services if Endeavor "obtained the capability and

personnel to provide its own rail services," and that "the Army never suggested or

indicated that there would be a required cost component associated with the joint use and

easement rights expressed in Section [A-3(c)] of the Deed."  Id. at ¶¶ 13–14.  The

government has submitted the deposition of Mr. Thomas Turner, the garrison manager at

TEAD, who states that Mr. Connell's understanding of the 1999 deed is not correct.

According to Mr. Turner, the Army understood that only the rail lines "specified in the

deed as Exhibit K and that had survey coordinates associated with it[]" were included in

the 1999 deed.  Turner Depos. at 73:7–12.

## III.    Procedural History

PID initially filed this action only in its name on May 13, 2015, alleging breach of

contract, takings, and promissory estoppel/detrimental reliance claims.  On February 11,

2016, the court dismissed PID's promissory estoppel and detrimental reliance claim and

stayed its takings claim.  On February 1, 2017, PID amended the complaint to, *inter alia*,

add PIP and Jade Street as additional plaintiffs.  The government filed an answer to the

amended complaint on February 28, 2017.  On March 30, 2017, plaintiffs filed a motion

for partial summary judgment on their breach of contract claims.  On May 26, 2017, the

government filed a response to plaintiffs' motion for partial summary judgment on their

breach of contract claims and a cross motion for partial summary judgment.  The first

oral argument on the parties' cross motions was held on September 28, 2017, and the

case was subsequently transferred to this judge on February 12, 2018.  Thereafter, the

government filed a supplemental brief on March 26, 2018, seeking dismissal of the case

on the grounds that it was time barred, and a second oral argument on the parties' cross

motions was held on August 8, 2018.

## IV.     Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC

56(a).  A genuine dispute is one that could permit a reasonable jury to enter a verdict in

the non-moving party's favor, and a material fact is one that could affect the outcome of

the lawsuit.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party

moving for summary judgment bears the initial burden of establishing the absence of a

genuine issue of material fact and can satisfy this burden by presenting evidence that

negates an essential element of the non-moving party's case.  *Celotex Corp. v. Catrett*,

477 U.S. 317, 322–23, 331 (1986).  To establish a genuine issue of material fact, a party

"'must point to an evidentiary conflict created on the record; mere denials or conclusory

statements are insufficient.'" *Radar Indus., Inc. v. Cleveland Die & Mfg. Co.*, 424 Fed. App'x 931, 936 (Fed. Cir. 2011) (quoting *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985)).  In evaluating motions for summary judgment, courts must draw any inferences from the underlying facts in the light most favorable to the non-moving party and may not engage in credibility determinations or weigh the evidence.  *See Anderson*, 477 U.S. at 255 (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  If no rational trier of fact could find for the non-moving party, a genuine issue of material fact does not exist and the motion for summary judgment may be granted.  *Matsushita Elec. Indus.*, 475 U.S. at 587 (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).  With respect to cross motions for summary judgment, courts must determine independently the appropriateness of summary disposition in a particular case, evaluating each motion on its own merits.  *Marriot Intern. Resorts, L.P. v. United States*, 586 F.3d 962, 968–69 (2009) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987)).

## V.   Discussion

### A.   Plaintiffs' Breach of Contract Claims Based on the 1999 Deed Are Not Time Barred

The government challenges the timeliness of plaintiffs' breach of contract claims under the United States Court of Federal Claims' statute of limitations.  28 U.S.C. § 2501.  Under section 2501, "[e]very claim of which the United States Court of Federal

Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." *Id.*; *see also Ingrum v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009). A cause of action first accrues "'when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action.'" *Brighton Vill. Assocs. v. United States*, 52 F.3d 1056, 1060 (Fed. Cir. 1995) (quoting *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988)). The government argues that because the alleged breach of the 1999 deed giving rise to plaintiffs' claims concerning the government's right to require and charge for rail services was first identified in the 1999 MOA that was entered into between the Army and the RDA, the breach occurred at that time and plaintiffs' claims are thus time barred. As discussed above, the MOA stated that the Army would "be the sole provider of rail service to access the rail classification yard and rail lines located on the [conveyed] property . . . under a separate agreement," and that "[s]uch services [would] be provided to the RDA at a reasonable cost." 1999 MOA at 1 (§ 3), 2 (§ 6(a)). The government argues that if the Army's refusal to provide free rail services and relinquish its control over rail facilities constitutes a breach of the 1999 deed, that breach took place on January 14, 1999, i.e., when the 1999 MOA was executed, because, unlike the 1999 deed, the MOA specified that the Army would require the RDA's successors-in-interest to use the Army's rail services at a reasonable cost.

In response, plaintiffs argue that the breach of contract did not occur in 1999 with the execution of the MOA. Rather, plaintiffs assert that the Army breached the terms of the 1999 deed when it insisted on payment from plaintiffs for using the Southern Access

Lines and for providing rail services in 2011.  In this connection, although plaintiffs do not use the term "repudiation" in their briefs, they are in effect arguing that the Army in the 1999 MOA may have repudiated the "no cost" commitment the Army made in the 1999 deed but that the repudiation was not a breach.  The breach, plaintiffs argue, did not occur until the Army required plaintiffs to pay for rail services starting in July 2011.

The court agrees with plaintiffs that their breach of contract claims based on the 1999 deed are not time barred because, to the extent the government repudiated the terms of the 1999 deed in the 1999 MOA by stating that the RDA and its successors-in-interest would have to pay the Army for the rail services needed to access the Rail Classification Yard and Southern Access Lines, the actual breach did not occur until the Army began to charge for those services in 2011.  A repudiation occurs when a party renounces a contractual duty before performance is due.  *Franconia Assocs. v. United States,* 536 U.S. 129, 143 (2002) (citing 4 A. Corbin, Contracts § 959, at 855 (1951)).  The Restatement (Second) of Contracts describes "repudiation" as a "'statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach.'"  *See Amber Res. Co. v. United States*, 538 F.3d 1358, 1368 (Fed. Cir. 2008) (quoting the Restatement (Second) of Contracts § 250 (1981)).  A repudiation "ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'"  *Franconia*, 536 U.S. at 143 (quoting *Roehm v. Horst*, 178 U.S. 1, 13 (1900)).  In other words, if a promisor repudiates a contractual obligation prior to the time for performance, that repudiation "'give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has

arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract.'" *Id.* (quoting *Roehm*, 178 U.S. at 13 (alterations and omission in original)). When a breach of contract claim is based on repudiation, the claim accrues either at the time of repudiation—if the non-breaching party chooses to treat the repudiation as a present breach—or at the time when performance is due—if the non-breaching party chooses to await performance. *Id.* at 144 (2002) (citing 1 C. Corman, *Limitation of Actions* § 7.2.1, at 488–89 (1991)). As such, plaintiffs' claims for breach of contract did not accrue until plaintiffs were charged for services in 2011 and thus, their claims for damages based on breach of the deed terms are not time barred.

**B.    Plaintiff PID Lacks Standing to Sue the United States**

The Tucker Act generally provides for this court's subject matter jurisdiction over certain claims and a waiver of the government's sovereign immunity over those claims. *Cardiosom, L.L.C. v. United States*, 656 F.3d 1322, 1325 (Fed. Cir. 2011). However, "[t]he government consents to be sued only by those with whom it has privity of contract[.]" *Erickson Air Crane Co. of Washington, Inc. v. United States*, 731 F.2d 810, 813 (Fed. Cir. 1984); *see also P. Gas and Electric Co. v. United States*, 838 F.3d 1341, 1350 (Fed. Cir. 2016) ("'To have standing to sue the sovereign on a contract claim, a plaintiff must be in privity of contract with the United States[.]'" (quoting *Anderson v. United States*, 344 F.3d 1343, 1351 (Fed. Cir. 2003))); *Coggeshall Dev. Corp. v. United States*, 23 Cl. Ct. 739, 742 (1991) ("Absent privity of contract, plaintiffs may not advance their claim against the government." (citing *United States v. Johnson Controls, Inc.*, 713

F.2d 1541, 1550 (Fed. Cir. 1983))).  Regarding, this court's jurisdiction over breach of contract claims arising from real estate deeds, this court has held that "a real estate deed granted by the federal government is an express contract that confers jurisdiction to this court for a breach of contract claim based on that deed." *U.S. Home Corp. v. United States*, 92 Fed. Cl. 401, 407–08 (2010).  This court has also held that successors-in-title to the original grantee may sue the government when the real estate deed expressly grants them the right to do so.  *See Coggeshall*, 23 Cl. Ct. at 742–43.

Because PIP and Jade Street hold deeds from successors-in-interest to the RDA, they themselves are also successors-in-interest to the RDA and have standing to challenge the Army's compliance with the terms of the 1999 deed.  The government does not dispute that PIP and Jade Street have standing to sue.  The government argues, however, that because PID has not produced any evidence demonstrating that it is also a successor-in-interest, PID lacks privity with the government under the 1999 deed and therefore has no standing to sue the United States for breach of the 1999 deed terms under the Tucker Act.  *See Myers Investigative & Sec. Services, Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002) ("'The party invoking federal jurisdiction bears the burden of establishing [the] elements [of standing].'" (internal quotations omitted)).  Moreover, the government argues that because PIP and PID are separate corporate entities, PID must have separate standing to initiate a claim.  *Erickson Air Crane*, 731 F.2d at 813 ("The government consents to be sued only by those with whom it has privity of contract[.]"); *see also S. California Fed. Sav. & Loan Ass'n. v. United States*, 422 F.3d 1319, 1330 (Fed. Cir. 2005) (rejecting the argument that "a party to one contract can be

deemed a party to a related contract simply because the separate contracts constitute components of one transaction.").

In response, plaintiffs argue that PID has standing both as a wholly owned subsidiary of PIP and as a party to the 2014 Easement and subsequent sales contracts entered into with the Army. Plaintiffs rely on *Caroline Hunt Tr. Est. v. United States*, 470 F.3d 1044 (Fed. Cir. 2006), to support their standing argument. In *Caroline Hunt*, the Caroline Hunt Trust Estate ("CHTE") made an offer to the Federal Home Loan Bank Board ("FHLBB") to acquire four insolvent thrifts through a wholly owned subsidiary called Southwest Savings Association ("SSA"). 470 F.3d at 1050. Following the approval of CHTE's application, the assets and liabilities of the four thrifts were conveyed to SSA. *Id.* at 1048. The *Caroline Hunt* court held that because CHTE was in direct privity with the government, it had standing to sue the government even though the assets and liabilities of the thrifts had been conveyed to its subsidiary SSA. *Id.* at 1051. Similarly, plaintiffs argue that here, even though the property and use rights under the 1999 deed have been conveyed only to its parent company PIP, PID has standing because, like CHTE, it is in direct privity with the government via the 2014 Easement and subsequent sales contracts, which are directly related to the 1999 deed.

The government argues that plaintiffs' reliance on *Caroline Hunt* is misplaced. Specifically, the government maintains that unlike here, where PID is not in privity with the Army under the 1999 deed, in *Caroline Hunt*, the Federal Circuit held that the plaintiff CHTE was in direct privity with the government, and therefore had standing to sue the government. *Id.* The Circuit held that the key question was whether the

government and the plaintiff had a contractual relationship without regard to the plaintiff's corporate relationships or the separate contract the plaintiff's subsidiary had with the government.  The Circuit made clear that CHTE had standing because of its contract with the government not because of its subsidiary's separate contract with the government.  *Id.* at 1049  n.3.

By contrast, in the instant case, the government argues, PID is not identified as an owner of the conveyed property in the deed PIP executed with one of the RDA's successors-in-interest.  In addition, the government maintains that the various contracts between PID and the Army are not relevant to the breach of contract claims based on the 1999 deed, because these contracts are simply for the Army's provision of rail services. The fact that the Peterson Group decided to use PID as the entity to sign an easement with the Army for rail services, the government maintains, did not give PID rights under the 1999 deed.

The court agrees with the government that PID lacks standing to sue the United States regarding a breach of the 1999 deed and agrees with the government's analysis of *Caroline Hunt*.  Although the 2014 Easement between PID and the Army states that PID is a "successor-in-interest" to the RDA, a review of the deeds demonstrates that this was an error because PID is not an owner of the conveyed property.  Moreover, PID cannot claim privity with the government as PIP's wholly owned subsidiary.  PID and PIP are separate legal entities and only PIP is in privity with the United States under the 1999 deed.  PID's contracts with the government for rail services do not give PID any enforceable rights under the 1999 deed.

**C.    The 1999 Deed Is Unambiguous and Does Not Include the Southern
Access Lines or a "No Cost" Easement to the Rail Classification Yard**

**a.    The Phrase "Certain Rail Lines" in the 1999 Deed Does Not Refer
to the Southern Access Lines**

The government argues that plaintiffs PIP and Jade Street cannot establish a

breach of contract regarding the Army's refusal to provide them access to the Southern

Access Lines because the 1999 deed did not include access to the Southern Access Lines.

The government states that plaintiffs' argument that the Southern Access Lines were

included in the 1999 deed is based on a misreading of the phrase "certain rail lines" in the

1999 deed, which the government argues, based on Exhibit K to the deed, unambiguously

included only the Main Line and the Western Pacific Line.  Specifically, the government

maintains that the Southern Access Lines, which are located south of the conveyed

property, are not depicted on Exhibit K to the 1999 deed and therefore cannot be included

within the phrase "certain rail lines."  The government argues that plaintiffs' contention

that the court should consider extrinsic evidence to discern the meaning of "certain rail

lines" is without merit because of Exhibit K.  The government asserts that where, as here,

the Exhibit K map clearly did not include the Southern Access Lines, plaintiffs cannot

rely on extrinsic evidence to create an ambiguity.  See *City of Tacoma, Dept. of Pub.

Utilities v. United States*, 31 F.3d 1130, 1134 (Fed. Cir. 1994) ("Outside evidence may

not be brought in to create an ambiguity where the language is clear.").

In response, plaintiffs argue that the 1999 deed is facially ambiguous and thus the

court should consider extrinsic evidence to determine the original parties' intent.

Specifically, plaintiffs assert that the 1999 deed is ambiguous because although section

A-3(c) refers to the Rail Classification Yard and "certain rail lines," Exhibit K to the deed includes a map that only depicts the Rail Classification Yard and does not label any rail lines.  In such circumstances, plaintiffs argue, the deed is ambiguous because it is unclear what lines were included in the deed.  Under Utah law, plaintiffs contend, extrinsic evidence can be considered.  *Daines v. Vincent,* 2008 UT 51, ¶ 25, 190 P.3d 1269 (internal quotation marks omitted); *McNeil Eng'g & Land Surveying, LLC v. Bennett*, 2011 UT App 423, ¶ 21, 268 P.3d 854 (citing *Daines*, 2008 UT 51, ¶ 25).[3]  According to plaintiffs, the 1999 MOA, the 2000 and 2008 Licenses, and the testimony of Jed Connell all suggest that the Southern Access Lines were covered by the 1999 deed.

The court agrees with the government that the language of the 1999 deed is not ambiguous as to whether the Southern Access Lines were covered by the "joint use" portion of the 1999 deed and thus, it is not necessary to look to extrinsic evidence to discern the meaning of the 1999 deed.  A contract is ambiguous when its language supports more than one reasonable interpretation.  *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992) (quoting *Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986)).  Section A-3(c) of the 1999 deed clearly states that "[t]he railroad classification yard and *certain rail lines* located on Army retained property, *as shown in Exhibit K*, are available for joint use with GRANTOR by the GRANTEE, and

---

[3] It is not disputed that the court looks to the law of the state in interpreting property instruments. *Chevy Chase Land Co. of Montgomery County, Md. v. United States*, 37 Fed. Cl. 545, 565 (1997) ("The nature of the interest conveyed is determined according to the law of the state where the conveyance occurred."); *Burkey v. United States*, 25 Cl. Ct. 566, 575 (1992) ("The law of the situs is applied in determining the nature of the property interest." (citing *Foster v. United States*, 607 F.2d 943, 948 (Ct. Cl. 1979))).

its successors and assigns."  Deed at 6 (§ A-3(c)) (emphasis added).  Based on the language of this provision, the original parties intended to contract for the joint use of the property described in Exhibit K to the 1999 deed.  It is beyond dispute that Exhibit K to the 1999 deed does not depict the Southern Access Lines.  *See, e.g.*, Pls.' Resp. at 17 (ECF No. 57).  The rail lines depicted in Exhibit K are the Main Line and Western Pacific Line.  The Southern Access Lines are not included in the map.  The map, which is part of the deed, clarifies which lines are included, and because the Southern Access Lines are not depicted, there is no ambiguity as to whether the Southern Access Lines are included within the phrase "certain rail lines" in the deed.

In this connection, plaintiffs cannot create an ambiguity based on the extrinsic evidence they have produced.  Extrinsic evidence may not be considered unless an ambiguity is identified in the contract language and cannot be brought in to create an ambiguity where the language is clear.  S*ylvania Elec. Prods., Inc. v. United States*, 458 F.2d 994, 1005 (1972).  The language of section A-3(c) of the 1999 deed, which included Exhibit K, is clear.  Plaintiffs' claims regarding their right to use the Southern Access Lines must therefore be rejected.

> **b.   The Non-Exclusive Easement Granted at "No Cost" in Section A-3(c) of the 1999 Deed Does Not Extend to Successors-in-Interest to the RDA**

The government makes two arguments as to why plaintiffs cannot establish a breach based on the "no cost" language in the 1999 deed.  First, the government argues that the easement promised in section A-3(c) is not sufficiently definite "so as to provide a basis for determining the existence of a breach and for giving an appropriate remedy[,]"

*Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332 (Fed. Cir. 2000) (quoting the

Restatement (Second) of Contracts §§ 71, 72 (1981)), because "the terms [are not] clear

enough to permit a determination of breach and remedies." *Doe v. United States*, 95 Fed.

Cl. 546, 584 (2010) (citing *Modern Sys. Tech. Corp. v. United States*, 979 F.2d 200, 202

(Fed. Cir. 1992)).  Specifically, the government argues that because the second part of

section A-3(c) fails to indicate the types of use the easement would permit and does not

place any limitations on such use or duration, the easement is unenforceable.

Second, the government argues that even if the court finds that the easement

language is enforceable, the Army has not breached section A-3(c) of the 1999 deed by

charging plaintiffs for its services because the "no cost" promise was made only to the

RDA and did not extend to the RDA's successors-in-interest.  Specifically, the

government maintains that the 1999 deed makes a clear distinction between when rights

were given to the RDA and its successors-in-interest and when only the RDA was the

intended grantee.  Under the 1999 deed, "GRANTEE" is defined as "the [RDA], unless

otherwise specifically provided herein[,]" while describing the term "GRANTOR" as

"the United States of America *and* its assigns."  1999 deed at 1 (emphasis added).  Thus,

by design, the government argues, the term "GRANTEE," unlike the term "GRANTOR,"

does not automatically apply to the RDA's successors-in-interest.  In support of this

contention, the government points to the fact that although most terms found in the 1999

deed apply to "the GRANTEE, and its successors and assigns," some terms, like the

promise of an easement in section A-3(c), apply to the "GRANTEE" alone and not to "its

successors and assigns."[4]  Importantly, the government argues that section D-18(f) of the deed expressly states that "[a]ll easements granted or contemplated to be granted to the GRANTEE by the GRANTOR pursuant to this Deed [would] be granted *at no cost to the GRANTEE[]*" without reference to successors-in-interest.  1999 deed at 23 (§ D-18(f)) (emphasis added).  Thus, according to the government, because the 1999 deed clearly envisaged the grant of a non-exclusive easement at no cost to the RDA alone, the government has not breached the terms of the 1999 deed.

In response, plaintiffs argue that the government has breached the "no cost" commitment in the 1999 deed because the deed unambiguously granted the easement rights at no cost to both the RDA and its successors-in-interest.  In this connection, plaintiffs assert that the government has erroneously separated the first and second sentences of section A-3(c), thereby concluding that the RDA was the only party granted easement rights under section A-3(c).  Instead, according to plaintiffs, the express language of the second sentence of section A-3(c) requires that both sentences be read together, which shows that the first sentence grants joint use rights to the RDA "and its successors and assigns," while the second sentence specifies that those joint use rights are to be enforced through a non-exclusive easement.  As such, plaintiffs maintain that the

---

[4] For example, in section A-5 of the 1999 deed, the Army "grant[ed] to the GRANTEE, *and its successors and assigns*, a non-exclusive permanent easement" for ingress and egress from the administrative area within TEAD.  Deed at 7 (§ A-5) (emphasis added).  By contrast, in section A-3(c) of the Deed, the Army promised that an easement for use of railroad facilities "will be granted *to the GRANTEE* under a separate agreement."  1999 deed at 6 (§ A-3(c)) (emphasis added).

easement was promised at no cost not only to the RDA but also to its successors-in-interest and, by extension, to plaintiffs.

The court agrees with the government that regardless of whether the provision regarding easements is enforceable, the provision plainly extended the "no cost" benefit only to the RDA and not to its successors-in-interest.  The court finds that both sentences in section A-3(c) must be read together.  The first sentence grants the relevant "joint use" rights to both the Army and the RDA, together with the latter's "successors and assigns," while the second sentence serves to clarify the method of securing such rights, i.e., through the use of an easement.  The only provision mentioning the cost of an easement in the 1999 deed is section D-18(f), which states that "[a]ll easements granted or contemplated to be granted to the GRANTEE by the GRANTOR pursuant to this Deed [would] be granted *at no cost to the GRANTEE*."  1999 deed at 23 (§ D-18(f)) (emphasis added).  The plain language of the deed states that the Army only committed to providing easements for access at "no cost" to the RDA alone.  "Where certain things are specified in detail in a contract, other things of the same general character relating to the same matter are generally held to be excluded by implication."  *Nicholson v. United States*, 29 Fed. Cl. 180, 196 (1993) (quoting Grismore on Contracts § 105, at 164); *see also Weston/Bean Joint Venture v. United States*, 123 Fed. Cl. 341, 373 (2015), *aff'd,* 652 F. App'x 972 (Fed. Cir. 2016) (explaining that under the *expressio unius est exclusio alterius* canon, "no exceptions should be read into the contractual language" of a contract "other than those specifically enumerated in the clause.").  By excluding the RDA's "successors and assigns" from the second sentence of section A-3(c) and section D-18(f),

yet at the same time including them in other portions of the deed, the Army only promised a future easement at no cost only to the RDA.  As such, the government did not breach the terms of the 1999 deed by requiring payment for any easement used by plaintiffs in connection with accessing the Rail Classification Yard.

## CONCLUSION

For the foregoing reasons, the government's motion for partial summary judgment is **GRANTED** and plaintiffs' motion for partial summary judgment is **DENIED**.[5]  The parties shall have until **September 17, 2018**, to file a joint status report setting forth a schedule for resolving the remaining claims in the litigation.

**IT IS SO ORDERED**.

s/Nancy B. Firestone
NANCY B. FIRESTONE
Senior Judge

---

[5] Having concluded that the 1999 deed did not provide for the "joint use" of the Southern Access Lines nor an easement for use of rail services at no cost to plaintiffs, the government is also entitled to summary judgment on plaintiffs' claims for declaratory and equitable relief regarding their reading of the 1999 deed.